Filed 8/15/24  P. v. Ram CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VICTORIA YVONNE RAM,<br><br>Defendant and Appellant. | F086334<br><br>(Super. Ct. No. SCR017623)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Proper Defense Law Corporation, Sally S. Vecchiarelli and Wesley L. Carlson, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

After a prolonged and troubled 14–year marriage, appellant Victoria Yvonne Ram placed pieces of glass and elemental mercury — apparently from a broken thermometer — into her 70 year–old husband Norberto's box of Cheerios.[1]

One morning soon thereafter, Norberto poured himself a bowl of Cheerios, added milk, and started to eat. He crunched down on something odd and found pieces of broken glass in his mouth. He grabbed the cereal box and his bowl and drove himself to the hospital. On the way, he met Victoria coming in the opposite direction, who disclaimed any knowledge of what he was talking about. He looked into the cereal box and saw several small metallic beads of what later turned out to be mercury. Although he was hospitalized for a week, he recovered because the amount of mercury absorbed was clinically minimal. Later, but well before charges were filed, Victoria contacted Norberto several times hoping to persuade him it was all merely an accident and to not "throw [her] under" the wheels of that ubiquitous "bus."

A jury convicted Victoria of willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, subd. (a) & 187, subd. (a)), poisoning with food (Pen. Code, § 347, subd. (a)(1)), elder abuse (Pen. Code, § 368, subd. (b)(1)), and victim dissuasion (Pen. Code, § 136.1, subd. (b)(2).) She was sentenced to an indeterminate life term on the attempted murder conviction and a consecutive 16–month determinate sentence on the dissuasion count. Two–year sentences were imposed on the poisoning and elder abuse counts, but were stayed under Penal Code section 654.

Victoria first claims the trial court prejudicially allowed testimony from a "care–coordinator" at a health care facility regarding statements Victoria made during an intake

---

[1] Because they share a common surname, we refer to appellant as Victoria and to her husband as Norberto. The record variously refers to him as Norberto, Norbert, and Noberto, but he testified his name was Norberto, which we shall use for consistency. We mean no disrespect by using their given names.

2.

interview after she was detained pursuant to a post–offense "5150" mental health hold.[2] She contends his testimony was inadmissible because it comprised and disclosed communications protected by the psychotherapist–patient privilege provisions of Evidence Code[3] section 1014 (the privilege), and that no statutory exceptions to the privilege applied. She further maintains that she did not waive the privilege by failing to assert it or object to the care–coordinator's same testimony at the preliminary hearing.

Second, Victoria claims her conviction on the victim dissuasion count must be reversed because after *People v. Reynoza* (2024) 15 Cal.5th 982 (*Reynoza*), in order to violate Penal Code section 136.1, subdivision (b)(2), a defendant must separately attempt to dissuade a victim *both* before *and* after charges are filed. Since her dissuasive conduct here only occurred prior to charges being filed — and despite the fact Norberto cooperated after charges were filed and testified at the preliminary hearing and at trial — she insists the evidence was nonetheless insufficient for a conviction for the offense. As an implicit corollary claim, she adds that the jury was therefore prejudicially misinstructed based on her post–*Reynoza* interpretation of the twofold nature of this dissuasion offense.

We affirm.

<h3 style="text-align:center">FACTUAL BACKGROUND</h3>

In February 2018, 69-year–old Victoria and 70-year–old Norberto[4] had been married, although not always blissfully, since 2004. In fact, at the time of the offenses,

---

[2] "5150" colloquially refers to Welfare and Institutions Code section 5150, one part of a statutory framework that, among other things, allows for the temporary involuntary detention of an individual when there is cause to believe they are a danger to themselves or others. (See Welf. & Inst. Code, § 5000 et seq.)

[3] All subsequent undesignated statutory references are to the Evidence Code.

[4] The pre–sentencing report indicates Victoria was born in 1949. Norberto testified at trial that he was born in 1947. The elder abuse statute defines an "elder" as "a person who is 65 years of age or older." (Pen. Code, § 368, subd. (g).)

they lived in separate parts of their "beautiful big" Coarsegold home in the foothills south of Yosemite.

They had occasionally discussed divorce, and Victoria had filed for divorce in both 2008 and 2016, but later dropped both petitions. Victoria resisted divorce because it would mean she would have to equally share the community property with Norberto. She believed he did not deserve it because it was her money and labor that had built and funded their home, and she did not want Norberto or his children from an earlier marriage to benefit from what she believed to be her exclusive legacy. Victoria had taken out at least three life insurance policies on Norberto, even though Norberto testified he did "not believe in life insurance policies."[5]

On the morning of February 21, 2018, Norberto poured himself a bowl of milk and Cheerios. When he was almost finished eating, he felt a crunch, which he thought was odd considering the cereal should have been soggy at that point. He took another spoonful and thought he broke a tooth; instead, he pulled two pieces of broken glass out of his mouth. Notably, Norberto was the only one in the two–person household to regularly eat Cheerios, and it would be "extremely unusual" for Victoria to eat them.[6]

Norberto took the cereal box and the bowl and drove himself to the hospital. On the way he met Victoria coming from the opposite direction and told her that he had just eaten glass in his cereal. She told him she did not know how that could have happened. He glanced into the cereal box and now saw some silver–colored metallic beads inside. While waiting at the hospital, Norberto examined his cereal bowl, and "put [his] finger on the biggest silver bead, and it separated [in]to a bunch of little beads." He immediately

---

[5] The record is unclear whether any of these policies were in effect in February 2018.

[6] The day after the incident, while a search warrant was being executed at the house, Victoria told detectives that Norberto normally ate Cheerios and she ate Lucky Charms, but claimed that "last week" she decided to have some Cheerios out of his "carton," but she "didn't have any crunching or anything in my bowl."

realized it was mercury, because he was experienced with the substance and had in fact collected several vials of mercury from old thermostat switches and thermometers over the years.  He said he then became "concerned" that Victoria was "the source of the glass and mercury in [his] food."

Norberto remained in the hospital for a week.  According to Norbert's adult daughter, she and her siblings stayed with their father the entire time and Victoria never came to visit him.  She had told the hospital that if Victoria attempted to contact Norberto to let her know, but she was never notified of any such attempts.  Norberto also said he did not ever see Victoria while he was in the hospital.

The parties stipulated that Norberto had ingested mercury that morning, that any "gastrointestinal absorption of elemental mercury [was] negligible," and that "elemental mercury is not poisonous and will not be harmful unless the person has an ulcer."  Even so, the testimony went a bit further than the parties' stipulation.  Although elemental mercury itself is not poisonous per se, and would normally pass through the system, the director of California Poison Control explained to the investigating detective that if mercury stayed in the system, as through an "ulcer *or cut* or something where instead of passing through, it got trapped and stayed in your system, then you would have issues with mercury being in your system."  (Italics added.)  In fact, the director was more concerned about the presence of broken glass than the mercury.[7]

The detective interviewed Victoria the next day while other sheriff's personnel were executing the search warrant at the house.  She initially denied knowing anything about what had happened the day before.  When he told her that mercury beads had

---

**7**  Indeed, what better vehicle to "cut" open internal portals for the accompanying mercury to enter the system than fragments of broken glass as they made their way through the gut?

appeared on Norberto's x-rays,[8] she said, " 'Oh, how did that happen?' " She added that she did not really know what mercury was and, when told that it was the "stuff" in old thermometers, she said she did not have any of those. She then showed the detective the thermometers she said she did have, but none was an old mercury–type.

Victoria explained to the detective that Norberto was her fifth husband, that she had used her own money to buy the property and build the house they lived in, and she did not like that Norberto would get half of the house if they divorced. She conceded she had taken out life insurance policies on Norberto in the past and also that she did not like Norberto lending their money to his daughters from his previous marriage. She added that Norberto's children hated her, but he was the cause. She admitted she had filed for divorce but withdrew the petitions, saying, "I really wish I would have gone through the divorce, but he wants to take everything even though he didn't put one damn penny into this house."

When the detective told her that Norberto had eaten mercury and glass in his Cheerios, Victoria again insisted she had no idea where that could have come from. Later in the interview, however, Victoria finally remembered that when she was cleaning out the pantry of old items, there was some "glass" from a broken "jar" she had accidentally dropped, and she put it in an old expired cereal box to be thrown away. In reality, Norberto's Cheerios box had an expiration date some eight months away.[9]

---

[8] The detective testified he had seen an x-ray at the hospital that showed "beads" in Norberto's "torso." They were "like little stars," and "you could see the metal illuminated through his digestive track, passing through the digestive track."

[9] During the search, several shards of glass were found on the kitchen floor. In addition, a trash can in the garage was "full" of broken glass items.

In a tackle box in the garage, three small vials of mercury about two inches long belonging to Norberto were found. Norberto told the detective he kept these vials along with his other "memorabilia" in his "man-cave" in the garage. The record does not reveal whether these three vials still contained the same amount of mercury they contained before the incident, nor whether Victoria even knew about them. However, Norberto said

Two of Victoria's neighbors, S.A. and C.S., testified about her behavior leading up to and after the incident. S.A. said Victoria had complained about Norberto, calling him an idiot, and wished that he would be gone. Afterwards, Victoria told S.A. that a candy thermometer had broken, and she had scooped the pieces into an "expired" cereal box that was supposed to be thrown away.

C.S. also testified that Victoria called Norberto an idiot and told her that she had put her own money into the house and was concerned about what would happen to it. Victoria insisted to C.S. that what happened to Norberto was purely accidental: a glass candy thermometer had broken on the countertop, and she swept the pieces into an "*empty* Cheerios box" instead of the trash, because the box was "right there." (Italics added.)

While Norberto was still hospitalized, C.S. said Victoria had a "meltdown" and she took Victoria to a clinic to get help. During this episode, Victoria repeated to C.S. that she did not want to get a divorce because she was afraid she would not get a truly fair distribution of the home and the other assets.

After Norberto was discharged from the hospital, his adult children took him in and would not allow him to go back home. Before any charges were filed, in early March 2018 Victoria contacted Norberto several times. On one occasion, she explained to him that she broke a thermometer while cooking a "turkey or something that needed a big thermometer" and had placed the broken glass and mercury into the Cheerios box. She also sent Norberto text messages and left voicemails, claiming it had all been an

_____

that he originally had four vials, three of which were still there later, and a fourth which was not. He believed he would have kept all four in the same box, but did not know what had happened to the fourth vial.

accident, that she was sorry, and asking him to "[p]lease don't throw me under the bus, please."**10**

Thomas Ellsworth testified that he worked at the Community Behavioral Health Center (the Center) as a care–coordinator performing case management tasks. Ellsworth's duties were to manage and guide the course of a patient's stay at the Center, which included doing an initial case management assessment early after the patient's admission, looking for resources in the person's life that may have broken down and led to crisis, and determining potentially available resources for discharge and aftercare.

Ellsworth said Victoria was admitted on a "5150" hold based on possible suicidal ideations and that he had interviewed her around March 1, 2018, soon after her admission to the Center. During this interview, she told him that she was in a bad marriage, that she received no affection or support from her husband, and that he favored his children over her. He was inattentive to her needs, and she was especially angry at him for not going to a recent neighborhood birthday party with her.

Victoria told Ellsworth she "found" a broken thermometer, picked out the big pieces of glass, and swept the smaller pieces of glass and the mercury into a box of Cheerios. He recalled that at one point she "sounded very intense, angry, [and] said, 'Crunch on this, you son of a bitch,' … as though she was talking to somebody [while] gesturing with her hand as she was making a sweeping motion." He explained her hand

_____

**10** The following are examples: "No[r]bert it's me. I just got a call from the Detective and they wanna see me. I'm your wife No[r]bert and I love you very, very, very much. All this was a major, major mistake. It was never supposed to happen. Please, I beg of you No[r]bert, if you love me in any way, please help me — please." "You've got a whole bunch of … messages from me and you can use [them] against me. Please don't throw me under the bus, please." "I never intended on hurting you. And I certainly didn't intend on – on murdering you. Now I've gone through so much pain and heartache from you. I just wanted to – I don't know what I wanted to. I want you to feel the pain I feel every day."

motions actually looked to him as if she were first breaking and crushing the thermometer into pieces and then sweeping them into the box.

Ellsworth said this startled him because he could feel the intensity and anger from Victoria while she was telling the story. In fact, she admitted to Ellsworth that she had decided to put the broken glass and mercury into Norberto's Cheerios because she was mad at him for not going to a birthday party, and she "wanted him to feel the sharp red pain that I feel every day."

Immediately afterwards, Ellsworth filed a report with the Adult Protective Services agency because he was concerned for Norberto's safety if and when Victoria was eventually released from her temporary hold. Since Victoria had earlier told him that Norberto had dementia, and that she was his caregiver, Ellsworth believed this triggered a legal requirement for him to make a report and referral, which he said he did in a report dated March 1, 2018.[11]

Victoria did not testify, and the defense presented no evidence.

### DISCUSSION

## I. THE PSYCHOTHERAPIST–PATIENT PRIVILEGE (§ 1014)

Victoria first claims the trial court prejudicially erred by permitting Ellsworth to testify about their conversation during her intake interview while she was at the Center. She contends his testimony was inadmissible because it would disclose confidential communications protected by the privilege codified in section 1014.

We first find the privilege was waived when, at the preliminary hearing, Ellsworth testified to their same conversation without objection. Waiver aside, we further find the trial court did not abuse its discretion in concluding there was no privilege because section 1024's dangerous patient exception vitiates the privilege on these facts.

---

[11] The report is not part of the record, nor is there any indication it was admitted into evidence.

### A. Additional Factual Background

At the 2019 preliminary hearing, Ellsworth testified to the same statements Victoria made to him during her intake interview at the Center that he would later repeat in his trial testimony in 2023. Defense counsel did not object to Ellsworth's testimony at that hearing, nor was the privilege even mentioned. Afterwards, no post–preliminary hearing privilege–based challenges to the information were raised.

Years later, just before trial was to begin, defense counsel, the same attorney as in 2019, for the first time made a motion to preclude Ellsworth's testimony based on the privilege. Counsel sought an evidentiary hearing to determine both whether the Center was a facility to which the privilege would apply and whether Ellsworth, as a care–coordinator doing case management at the Center, was a "psychotherapist" within the meaning of the privilege.

Markedly, although somewhat cryptically, defense counsel acknowledged that he "did not raise the objection to Mr. Ellsworth testifying [at the preliminary hearing] when it appeared to [him] that [the prosecutor] had laid a foundation, um, that was appropriate and sufficient. And so, *it was possibly waived at that time*. I'm not sure."[12] (Italics added.)

In response, the prosecutor first argued that Ellsworth did not qualify as a psychotherapist under the privilege, although he admitted he was unsure whether the Center itself would be included. However, even if both were true, he argued that the privilege "was otherwise waived at preliminary hearing." In his reply, however, defense counsel did not address the prosecutor's waiver contention.

---

[12] At the preliminary hearing, the prosecutor initially asked Ellsworth for whom he worked, his job title, and his duties. Ellsworth said he was not licensed to practice medicine or psychology, was not a licensed clinical social worker, nor was he in a variety of other semi–related positions. In defense counsel's cross–examination, no additional foundational questions were asked.

10.

The trial court said it would review the preliminary hearing transcript and set an evidentiary hearing for the following day to hear testimony from Ellsworth regarding the privilege. At the hearing, Ellsworth again testified as to his role and duties as a care–coordinator at the Center, ostensibly to determine whether he was a psychotherapist within the meaning of section 1010, and therefore whether the privilege was even germane.[13] Ellsworth repeated his earlier job description, but nothing was elicited with regard to the Center itself.

The trial court initially granted the motion, finding Victoria's statements to Ellsworth were privileged and inadmissible, although it cautioned that its ruling could be revisited. The question of waiver was neither mentioned nor discussed, and the prosecutor did not press for a ruling on his waiver claim.

The following day the prosecutor returned and asked the court to revisit its ruling, not on waiver grounds, but on two statutory *exceptions* to the privilege: sections 1024 (public safety) and 1026 (mandatorily reported public records). After argument and a review of the relevant authorities, the court granted the prosecutor's request to reconsider and found that Victoria's statements to Ellsworth were not privileged and were in fact admissible under section 1024.[14]

---

[13] Section 1010 expansively defines the term "psychotherapist" for purposes of the privilege in 15 subdivisions. (§ 1010, subds. (a)–(o).) None of these subdivisions describes Ellsworth's care–coordinator role at the Center, but the section also contains a proviso that " 'psychotherapist' means a person who is, *or is reasonably believed by the patient to be*," a person described in those subdivisions. (§ 1010, italics added.) However, there is no evidence — either at the preliminary hearing, the pretrial motion hearing, or even later at trial — as to what Victoria "believed" Ellsworth's role to have been during that intake interview, let alone whether it was reasonable or not. Based on its subsequent rulings, the trial court may have simply assumed she had. In any event, we shall assume, without deciding, that she did.

[14] Section 1024 provides that "[t]here is no privilege … if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." (§ 1024.) Although the

"I think it would be incongruous for me to say [Ellsworth] fits the definition [of a psychotherapist] under [section] 1010 and not [section] 1024. Mr. Ellsworth testified that the defendant identified that her husband had dementia and that she was the primary caregiver and had accepted the role as such and that in light of the information she had shared with him, he had a concern for [Norberto's] future safety, and he was a mandated reporter, and he had to report. And for those reasons, I feel that [section 1024] applies, and therefore, I'm going to allow the testimony."

Again, however, there was no mention of waiver.

Victoria initially appealed contending only that the trial court prejudicially erred by rejecting her privilege claim. We ordered the parties to provide supplemental briefing to address the threshold question of whether Victoria's failure to assert the privilege at the preliminary hearing constituted a waiver. In response, Victoria now additionally contends that the privilege was not waived.

## B. Legal Background

"Evidentiary privileges are creatures of statute" (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1129; see § 911, subd. (c)), and we "may not add to the statutory privileges except as required by state or federal constitutional law," nor may we "imply unwritten exceptions to existing statutory privileges." (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 373; *People v. Gionis* (1995) 9 Cal.4th 1196, 1207.)

In general, "[a] patient has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between the patient and his or her psychotherapist." (*People v. Nieves* (2021) 11 Cal.5th 404, 431 (*Nieves*), citing §§ 1014 & 1012.) Therefore, communications between a psychotherapist and patient are usually privileged and, if made " 'in the course of the … psychotherapist–patient relationship,' " are " 'presumed to have been made in confidence.' " (*Fish v. Superior Court* (2019) 42 Cal.App.5th 811, 817 (*Fish*); quoting § 917, subd. (a).)

court rejected the section 1026 exception, the People have not resurrected it on appeal, and we deem it abandoned.

12.

Consequently, "[i]n California, as in all other states, statements made by a patient to a psychotherapist during therapy are generally treated as confidential and enjoy the protection of a psychotherapist–patient privilege. [Section] 1014 — the basic provision setting forth California's psychotherapist–patient privilege — provides in relevant part: '*Subject to Section 912 [(waiver)] and except as otherwise provided in this article*, the patient … has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist … .' [Section] 1012, in turn, defines ' "confidential communication between patient and psychotherapist" ' to mean 'information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation, or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted, and includes a diagnosis made and the advice given by the psychotherapist in the course of that relationship.' " (*People v. Gonzales* (2013) 56 Cal.4th 353, 371 (*Gonzales*), italics added; see *Jaffee v. Redmond* (1996) 518 U.S. 1, 12 ["[A]ll 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege"].)

At the same time, however, "[t]he Evidence Code contains various exceptions that limit the applicability of the psychotherapist–patient privilege. ([§§] 1016–1027.) '[F]or reasons of policy,' such exceptions must be 'construe[d] narrowly,' and the privilege must be 'broadly construed in favor of the patient.' " (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 771 (*Mathews*); see *Nieves, supra,* 11 Cal.5th at p. 432 [the privilege "is to be liberally construed in favor of the patient"].)

" 'Where the [privilege] is claimed as a bar to disclosure, the claimant has the initial burden of proving the preliminary facts to show the privilege applies.' " (*Fish,*

*supra,* 42 Cal.App.5th at p. 818,)  "Preliminary facts" means proof of a psychotherapist–patient relationship: both that the person that the claimant consulted was a "psychotherapist" under section 1010 and that the claimant was a "patient" within the meaning of section 1011.  (*Fish,* at p. 818; see § 1010, subds. (a)–(o) ["psychotherapist" defined] and § 1011 [" 'patient' means a person who consults a psychotherapist … for the purpose of securing a diagnosis or preventive, palliative, or curative treatment of his mental or emotional condition"].)

"Once the claimant establishes the preliminary facts of a psychotherapist–patient relationship, the burden of proof shifts to the opponent of the privilege. To obtain disclosure, the opponent must rebut the statutory presumption of confidentiality set forth in section 917: 'Whenever a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the … psychotherapist–patient … relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential.' " (*Story v. Superior Court* (2003) 109 Cal.App.4th 1007, 1015 (*Story*).)

Relevant here, however, "[a]lternatively, the opponent of the privilege may show that the privilege has been *waived* under section 912, *or* that the material sought [to be disclosed] falls within one of the *exceptions* to the psychotherapist–patient privilege codified at sections 1016 through 1027." (*Story, supra,* 109 Cal.App.4th at p. 1015, italics added.)  We address these two statutory limitations on the privilege below, and conclude both apply here.

## C.  Analysis

### 1.  Waiver

We begin by noting that the relevant facts are not in dispute.  No one contests that at the preliminary hearing Ellsworth was called by the prosecutor and testified to statements Victoria made to him during her "5150" hold.  The parties also agree the

preliminary hearing was a "proceeding in which [Victoria] ha[d] legal standing and the opportunity to claim the privilege," and that she was "the holder of the privilege." (§§ 912, subd. (a) & 1013.) Similarly, it is uncontested that Ellsworth's testimony at the preliminary hearing largely mirrored his later trial testimony. Finally, no one disputes that the defense never "claimed" or asserted the privilege at the preliminary hearing, nor that it was discussed or ruled upon by the magistrate.

Furthermore, the record shows that in cross–examination at the preliminary hearing defense counsel elicited *other* statements Victoria made to him during his interview, and in doing so, he *divulged* these communications. Some were favorable to Victoria — for example, that she told Ellsworth she did not intend Norberto to die or intend to kill him — but counsel also asked Ellsworth to repeat some of her less favorable ones. In other words, defense counsel *caused to be disclosed* several of Victoria's communications with Ellsworth during her interview, some of which were not elicited by the prosecutor, and were in fact outside the scope of the direct examination.

Finally, as previously noted, the record also shows that defense counsel later admitted that he "did not raise the [privilege] objection to Mr. Ellsworth testifying [at the preliminary hearing] when it appeared to me that [the prosecutor] had laid a foundation, um, that was appropriate and sufficient. And so, [the privilege] was possibly waived at that time. I'm not sure." In other words, defense counsel was aware of the privilege at the time of the preliminary hearing and chose not to assert it.

Nevertheless, Victoria still insists that the privilege was not waived in these circumstances because:

(1) The trial court never ruled on the prosecutor's waiver claim, and because the court initially ruled that the privilege did apply and only later went on to address the section 1024 exception in reconsidering its ruling, it "implied[ly]" rejected the prosecutor's waiver argument by considering the merits of the privilege claim. On review, she insists, we must defer to this implicit "factual determination."

15.

(2)  Victoria did not "knowingly" waive the privilege because neither she nor her counsel knew or could have known that it applied to Ellsworth's testimony at the preliminary hearing.  Furthermore, their supposed ignorance of this fact was "reasonable," thereby obviating any waiver under section 912.[15]

We are not persuaded by either contention.

### a.  The Trial Court's "Implied" Factual Finding

Victoria urges that the trial court impliedly considered and rejected sub silentio the prosecutor's waiver argument at the pretrial motion hearing by deciding the privilege issue on the merits.  She maintains we must defer to this implicit "factual finding," even though we do not know from this record whether it was factual, legal, or both, or upon which facts or law the trial court based this "implied" ruling.[16]        Victoria further asserts that this implied factual finding "should not be disturbed on appeal," or, in other words, suggests we are bound by it, and it is apparently unreviewable.  The cases she cites do not support such a blind standard of appellate review on such a silent record, especially where the defense offered no argument or authorities to counter the

---

[15] Victoria adds a third waiver argument, stating that even though the elder abuse mandatory reporting requirements of the Welfare and Institutions Code may have *exempted* some of Ellsworth's testimony from a claim of privilege, the limited scope of that authorization did not engender a complete waiver of the privilege with regard to all aspects of his later testimony.  However, this argument conflates *waiver* of the privilege with an *exception* to the privilege, and our focus here is initially on section 912's waiver provisions, not on the effects of any statutory exemptions, which we address separately below.

[16] Or even if the trial court simply assumed for the sake of argument that the privilege was not waived at the preliminary hearing and instead chose to rule on the merits.  Notably, at the pre–trial motion hearing, defense counsel did not counter the prosecutor's waiver argument at all, thus leaving as established his earlier admission that the privilege "possibly" had been waived.  It is hard to fathom what "facts" the trial court could then have *impliedly* based its so–called "factual finding" on the issue of waiver.

prosecutor's waiver argument, and where counsel candidly conceded that the privilege may actually have been "possibly waived."[17]

We do agree that generally whether waiver "has occurred is often a factual question, typically reviewed for substantial evidence." (*Lynch v. California Coastal Commission* (2017) 3 Cal.5th 470, 476.) " ' "When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling." ' " (*Ibid.*) Because the determinative facts regarding the issue of waiver in this case are undisputed, and the question is based solely on the legal effects of those facts, our review of the waiver question is de novo. (*People v. American Surety Co.* (2019) 31 Cal.App.5th 380, 390, fn. 5.)

Turning to the question of waiver on these facts, we begin by observing that section 912 explicitly defines "waiver" for Evidence Code–based privileges in two different ways. "Waiver of the privilege occurs when the holder of the privilege has disclosed a significant part of the communication *or* consented to disclosure." (*Nieves, supra,* 11 Cal.5th at pp. 431–432, italics added.) More specifically, "the right of any person to claim a privilege provided by … [section]f 1014 … is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion,

---

[17] Indeed, the main case Victoria relies on, *People v. Manning* (1973) 33 Cal.App.3d 586, itself noted that there are "exceptions to the presumption of implied findings to support [an evidentiary] ruling," including when, just as here, the underlying facts are uncontested. (*Id.* at p. 602.) Moreover, *People v. Manning* is not a privilege case at all; it involved a motion to suppress evidence under Penal Code section 1538.5. (*Ibid.*)

The other cases she cites in support of this argument are also inapposite. (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1102 [trial court *made* findings and rulings on a waiver assertion; it was not an "implied" ruling]; *Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 116, 129 [writ granted and remanded with orders to hold an evidentiary hearing and expressly *rule* on attorney–client privilege waiver claim where there were *disputed facts*].)

has *disclosed* a significant part of the communication *or* has *consented to disclosure made by anyone.* Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, *including failure to claim the privilege in any proceeding in which the holder has legal standing and the opportunity to claim the privilege.*" (§ 912, subd. (a), italics added.) Each is applicable here.

First, at the preliminary hearing defense counsel inquired of Ellsworth as to several statements Victoria had made during the interview, most importantly including exculpatory ones that had not been brought out by the prosecutor on direct examination, thereby waiving "with respect to a communication protected by the privilege" by asking Ellsworth to "disclose[] a significant part of the communication." (§ 912, subd. (a).)[18]

So too here. Defense counsel was not compelled to elicit from Ellsworth those additional statements she had made during the interview. Indeed, by doing so he was able to elicit potentially strong exculpatory evidence of Victoria's intent without having to call Victoria to the witness stand. (See § 356.) Having done so, however, counsel paid a price: he disclosed a "significant part of the communication," and in doing so waived the privilege. (§ 912, subd. (a).)

Second, in the other way in which the privilege may be waived, defense counsel failed to ever assert the privilege at the preliminary hearing, even though Victoria

---

**18** *People v. Garaux* (1973) 34 Cal.App.3d 611 is similar. In that case, the defendant invoked the privilege to preclude a psychiatrist from testifying at trial to communications made to him by the defendant. The Court of Appeal found that the defendant had waived the privilege under section 912 by his having called the psychiatrist to testify regarding those same statements in an earlier but unrelated case. In doing so, the defendant had thereby consented to disclosure of his communications to the psychiatrist — communications that would otherwise have remained privileged. The court held the privilege had been waived at the later trial because under section 912 the defendant himself "ha[d] disclosed a significant part of the communication or had consented to such disclosure" in the earlier case. (*People v. Garaux*, at p. 613.)

18.

undoubtedly had standing to do so.  Counsel admitted he had knowledge of the privilege, and therefore had an opportunity to assert it, and conceded that he had "possibly" waived it, as he later put it.  He was correct.

Both alternative grounds for waiver under section 912 apply here and we conclude the privilege was therefore waived.

b. *The Validity of the Waiver*

Victoria alternatively contends that even if there was a waiver within the meaning of section 912, it was not a valid waiver.  We again disagree.

Victoria initially argues that defense counsel "could not establish" facts necessary to show that Ellsworth's testimony fell within the privilege because preliminary hearings are  "not to be used as a means of defense discovery," citing Penal Code section 866, subdivision (b).  (Underscore omitted.)  Not so.

First, there is nothing in the record to show that defense counsel declined to assert the privilege because of any defense discovery limitations at preliminary hearings. Indeed, such a claim is belied by the simple fact that defense counsel actually himself pursued further questioning of Ellsworth outside the scope of the prosecutor's direct examination in order to elicit exculpatory evidence regarding Victoria's intent, but to which the prosecutor did not object, on "discovery" grounds or otherwise.

Second, foundational questioning involving a witness's qualifications and whether their testimony is admissible at a preliminary hearing for whatever reason, including evidentiary privileges, is not "a means of defense discovery" at the preliminary hearing  — that is why it is "foundational" — and Victoria cites no authority to suggest otherwise.  Indeed, to accept her argument, defense counsel at a preliminary hearing could never voir dire a witness to examine their expert qualifications, the underlying foundations for the results of scientific analyses, the voluntariness of a defendant's statements, or even whether a testifying law enforcement officer met the necessary

19.

qualifications to offer hearsay at a preliminary hearing in the first place, because such would constitute an attempt at improper "defense discovery."

In a similar vein, Victoria speculates that had defense counsel attempted to assert a privilege objection at the preliminary hearing and explore the underlying foundations for Ellsworth's testimony, a hypothetical prosecutor's "objection on the grounds of improper discovery would likely be sustained" as an improper defense discovery inquiry. She provides no authority or reasoned basis for such a claim, and we cannot entertain arguments that are solely preceded by "would be likely" qualifications without some evidentiary or legal support.

Circling back to her original argument, Victoria lastly concludes by insisting that "[t]here is substantial evidence in the record" for the trial court to have impliedly found that "the privilege was not waived" at the preliminary hearing because facts possibly "showing the existence of the privilege were not known," "could not be developed at the time," and that any "waiver of the privilege could not have been knowing and voluntary." She does not spell out, however, what this "substantial evidence" was.

As already discussed, this argument is defeated by the fact that defense counsel admitted that he was aware of the privilege at the preliminary hearing, and although not totally sure whether it applied, he had concluded it did not. Counsel did not attempt to inquire further of Ellsworth whether or how the privilege might be applicable, and instead decided the prosecutor "had laid a foundation, um, that was appropriate and sufficient." Nothing prevented counsel from exploring foundational questions to Ellsworth about his duties, or the nature of the Center, that might have been relevant to the privilege. He chose, perhaps for strategic reasons given Victoria's other exculpatory statements regarding intent, not to do so. Appellate counsel's unsupported speculation that the prosecutor *would* have objected, and the magistrate *would* have sustained such an objection on "discovery" grounds, is not evidence.

For the same reasons, Victoria's claim that her waiver was not knowing and voluntary is defeated by her counsel's acknowledgement to the trial court that he knew of the privilege, thought the prosecutor had excluded its applicability, did not pursue it at the preliminary hearing, and later conceded that "it was possibly waived." Victoria did not testify at the pretrial motion hearing and there was no defense evidence offered to undermine defense counsel's explanation for why he had not asserted the privilege at the preliminary hearing. The only reasonable factual inferences to be drawn from this record are that the defense was aware of the privilege, Ellsworth testified without objection, the defense itself voluntarily elicited additional evidence of Victoria's supposedly privileged communications with Ellsworth, and the defense did not assert the privilege until four years later at trial.

Appellate counsel's attempt to cabin section 912 by forcing an interpretation that any privilege waiver at the preliminary hearing should be express, personal, knowing, and voluntary is not only unsupported by any authority, it is also contradicted by the words of the statute itself. Rather, waiver need not be express, for the simple reason that a "[c]onsent to disclosure" may equally be "manifested by … *failure to claim the privilege* in any proceeding in which the holder has legal standing and the opportunity to claim the privilege." (§ 912, subd. (a), italics added.) This is exactly what happened in this case.

We conclude that Victoria's claim that Ellsworth's trial testimony was foreclosed by the section 1014 privilege fails because the privilege was waived within the meaning of section 912 when Ellsworth testified without objection at the preliminary hearing to the presumedly confidential communications between them during her intake interview. Consequently, she may not now assign reversible error to the trial court's ultimate ruling allowing Ellsworth's trial testimony.[19]

---

[19] Relegated to a footnote in her supplemental brief, Victoria for the first time throws out a passing remark that if it had been "obvious" that the privilege applied at the

## 2. Section 1024's Exception to the Privilege

Waiver notwithstanding, we also find Victoria's privilege claim fails on the merits. The trial court did not prejudicially err in finding that section 1024 established an exception to the privilege under the circumstances of this case and that Ellsworth's testimony was therefore admissible at trial.

### a. Standard of Review

Unlike Victoria's claim about the trial court's so–called *implied* "factual finding" rejecting waiver under section 912 discussed above, here the trial court *explicitly* ruled that, based on what Victoria had said to Ellsworth during her interview a statutory exception to the privilege applied and his testimony was thus admissible. As such, our standard of review is also different.

In general, " '[w]e review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Flores* (2024) 101 Cal.App.5th 438, 449.) Moreover, "[o]n appeal we consider the correctness of the trial court's ruling *itself*, not

---

preliminary hearing, she would "have a strong claim for ineffective assistance of counsel due to defense counsel's failure to object" at that hearing. However, it is unclear exactly what she means by "obvious," or obvious to whom, or why it matters.

More importantly, appellate counsel does not actually make an ineffective assistance of counsel claim. The lack of any authority, discussion, or argument in support of this assertion requires no response. We will not entertain a substantive contention raised in two–lines of a four–line footnote, with no argument or authorities in support. " '[E]very brief should contain a legal argument with citation of authorities on the points made.' " (*People v. Stanley* (1999) 10 Cal.4th 764, 793.) "If a party's briefs do not provide legal argument and citation to authority on each point raised, ' "the court may treat it as waived, and pass it without consideration." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363–364; see Cal. Rules of Court, rule 8.883(a)(1)(A) [briefs must support "each point by argument and, if possible, by citation of authority"].) We do so here.

the correctness of the trial court's *reasons* for reaching its decision." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145; see *People v. Zapien* (1993) 4 Cal.4th 929, 976 [if the trial court's ruling is correct " ' "upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion" ' "].)

Specific to evidentiary privileges "[w]e review the trial court's privilege determination under the substantial evidence standard. ' " 'When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it [citations].' " [Citation.] Accordingly, unless a claimed privilege appears as a matter of law from the undisputed facts, an appellate court may not overturn the trial court's decision to reject that claim.' " (*Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417, 442–443; *In re Kevin F.* (1989) 213 Cal.App.3d 178, 183 (*Kevin F.*) [trial court's conclusion that the section 1024 exception applies "is reviewable under an abuse of discretion standard"].)

Finally, even if a ruling admitting evidence was error, a judgment may only be set aside if the reviewing court concludes that the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; § 353, subd. (b) .) This basic "constitutional constraint, which applies in civil as well as criminal cases, 'generally "prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial." ' " (*Tricoast Builders, Inc. v. Fonnegra* (2024) 15 Cal.5th 766, 786 (*Fonnegra*).)

   b. *Section 1024*

As discussed, communications between a psychotherapist and patient are normally privileged if made in the course of the psychotherapist–patient relationship and are further presumed to have been made in confidence. (*Fish, supra,* 42 Cal.App.5th at

p. 817.)  Nevertheless, " '[d]espite its broad and protective nature, the psychotherapist–patient privilege is not absolute.  [Citation.]' "  (*Id.* at p. 818.)  "Upon a proper showing, the records of psychotherapy may be disclosed in litigation."  (*Story, supra,* 109 Cal.App.4th at p. 1014.)

As noted above, among the statutory exceptions to the privilege, section 1024 states that "*[t]here is no privilege* … if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger."  (§ 1024, italics added.)  Thus, if the therapist who is providing treatment to the patient concludes that the patient is a danger to himself or herself, or to others, and that disclosure of the contents of the therapy session is necessary to prevent the threatened danger, the therapist may later testify as to those statements over a privilege objection.  (*In re A.C.* (2019) 37 Cal.App.5th 262, 266, citing *Gonzales, supra*, 56 Cal.4th at pp. 371, 380; cf. *People v. Hopkins* (1975) 44 Cal.App.3d 669, 674 (*Hopkins*) [§ 1024's "interference" with a patient's interest in the confidentiality of the psychotherapist relationship was both "reasonable" and "proper"].)

There was a question raised below whether Ellsworth was a "psychotherapist" within the meaning of the privilege, although there was no dispute that Victoria was a "patient," and the trial court ultimately found that he was.  However, the court also stated: "I think it would be incongruous for me to say [Ellsworth] fits the definition [of a psychotherapist] under [section] 1010 and not [section] 1024."[20]

The trial court's observation apart, Victoria now insists that although the definition of "psychotherapist" applies to Ellsworth for purposes of section 1010 — otherwise there

---

[20] The privilege only protects statements made by a patient to a psychotherapist *during therapy*.  The term "therapy" is not further defined in the Evidence Code, and the parties have not addressed whether Ellsworth's intake interview as a case–coordinator at the Center constituted "therapy."  We will again assume without deciding that it did.

would be no privilege to protect — it does not equally apply to him for purposes of the section 1024 exception. She maintains that even though Ellsworth was a psychotherapist under the Evidence Code, he was not a sufficiently qualified psychotherapist to determine whether Victoria was "dangerous" in such a way as to trigger the exception. She provides no authority for this distinction.[21] The Evidence Code does not provide for a kind of hierarchy of psychotherapists, some of whom are allowed to make determinations regarding exceptions to the privilege, but others who are not.

Moreover, this ignores the fact that section 1010 plainly provides that "[a]s used *in this article*, 'psychotherapist' means a person who is or is reasonably believed by the patient to be" a psychotherapist, and then lists the numerous non–exclusive examples of such persons. (Italics added.) Victoria cannot have it both ways: sections 1010 and 1024 are *both* found in Article 7 of Division 8 [Privileges], and Chapter 4 [Particular Privileges] of the Evidence Code. Therefore, it is an all or nothing situation, which was something the trial court correctly found.

Similarly, section 1024 "does not authorize courts to determine what kinds of patients are dangerous. By the statute's plain terms, it is up to 'the psychotherapist' to make that determination for each patient." (*Mathews, supra,* 8 Cal.5th at p. 772.) Thus, section 1024's applicability only arises when we examine whether the *psychotherapist* had reasonable cause to believe *and* actually believed that the patient was dangerous. (*Mathews* at p. 772, citing *Gonzales, supra,* 56 Cal.4th at p. 380, fn. 12, and *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 431 (*Tarasoff*), statutorily

---

**21**  Victoria's citation to *Gonzales, supra,* 56 Cal.4th at pp. 373–374 is inapt on this point because the case involved whether limited disclosures to certain third parties constituted *waivers*. Here there was no third party.

modified on other grounds by Civil Code section 43.92 as recognized in *Geffner v. Board of Psychology* (2024) 100 Cal.App.5th 19, 46, fn. 16.)[22]

In *People v. One Ruger .22–Caliber Pistol* (2000) 84 Cal.App.4th 310, because of his strange behavior, the appellant was taken into custody for a "5150" psychiatric evaluation. Police also confiscated his cache of firearms. The People filed a petition to determine whether returning his guns would likely endanger appellant or others. Over objection, the treating psychiatrist testified that he believed the appellant should be deprived of the guns for his own safety and for the safety of the public at large, and the trial court agreed. On appeal, the appellant argued the psychiatrist's testimony disclosed privileged communications and was not admissible at the hearing. The Court of Appeal concluded the testimony of a psychiatrist who examines a person detained for evaluation under "5150" is admissible and not covered by the privilege. (*Id.* at pp. 314–315.) Simply put, just as in the current case, "[i]nformation obtained on the question of endangerment during ["5150"] treatment and evaluation [was] admissible because it [was] 'necessary to prevent the threatened danger.' " (*Id.* at p. 315, quoting § 1024.)

Here, the trial court found that the dangerous patient exception of section 1024 applied, and substantial evidence supports that conclusion. Victoria told Ellsworth that she decided to put the broken glass and mercury into Norberto's Cheerios because she was angry with him for not going to the birthday party, and she "wanted him to feel the sharp red pain that I feel every day." Ellsworth said she made a sweeping motion with her hand as if she were crushing the thermometer into pieces and pounded on the table,

---

[22] Although not a section 1024 case, in *Tarasoff* our Supreme Court dealt with a more general question of duty in a common law cause of action for negligent failure to warn. After balancing the statutory privilege with the public interest in safety from violent assault, the court concluded that "the public policy favoring protection of the confidential character of patient–psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others. *The protective privilege ends where the public peril begins*." (*Id.,* 17 Cal.3d at p. 442, italics added.)

stating, "Crunch on this, you son of a bitch." Ellsworth was even startled by Victoria's intensity and anger while she was talking to him. Victoria had told Ellsworth that Norberto suffered from dementia, and that she was his caregiver, which caused special concern to Ellsworth. What could happen in the future if Victoria again became overly angry about the community property laws, or if Norberto refused to go to another neighborhood birthday party, was disturbingly uncertain, and more so if Norberto's dementia were to worsen and his ability to care for himself were to lessen.

We acknowledge that even if some of a patient's statements to the psychotherapist are not privileged, and are admissible under the section 1024 exception, the other non–dangerous portions of a patient's confidential communications with the therapist remain privileged. "[T]he mere fact that some statements are nonprivileged by operation of section 1024 does not automatically make *all* of defendant's confidential communications to his therapists available to the prosecution." (*People v. Wharton* (1991) 53 Cal.3d 522, 554, italics added.) Put differently, section 1024 "is narrow in the sense it only permits disclosure of those communications which triggered the psychotherapist's conclusion that disclosure of a communication was needed to prevent harm." (*San Diego Trolley, Inc. v. Superior Court* (2001) 87 Cal.App.4th 1083, 1091, disapproved on other grounds in *Williams v. Superior Court* (2017) 3 Cal.5th 531, 557, fn. 8.)

Nonetheless, here the trial correctly limited Ellsworth's testimony at trial. Victoria concedes that the trial court "had to reign [*sic*]" in the prosecutor, when he began questioning Ellsworth about Victoria's statements "about life insurance policies and wills." The court bluntly told the prosecutor that the exception was limited in scope to the information that Ellsworth had to report.

More importantly, the court told *the jury* that it was "striking everything about [Ellsworth's] testimony regarding the will and finances." "We presume that a jury follows the court's admonishments," absent evidence to the contrary. (*People v. Schultz* (2020) 10 Cal.5th 623, 673–674.) Furthermore, the evidence regarding wills and

27.

insurance policies, and Victoria's obsession with finances, was already before the jury, both from the testimony of witnesses other than Ellsworth and from Victoria's non–privileged statements to the investigating detective. There is no perceivable prejudice. (*Fonnegra, supra,* 15 Cal.5th at p. 786.)

Substantial evidence supports the trial court's conclusion Ellsworth had reasonable cause to believe that when Victoria was released from her "5150" hold, she would continue to be a danger to Norberto. Indeed, as a mandatory reporter, Ellsworth said he was also required to make a report to the Adult Protective Services agency based on what she had said to him in the interview.

Because Ellsworth's concern for Norberto's future safety was reasonable, the trial court did not abuse its discretion in permitting Ellsworth to testify to the bases for his concern. (See *Kevin F., supra,* 213 Cal.App.3d at p. 183 [defendant told psychotherapist he committed arson and was fascinated with fire; psychotherapist had reasonable cause to believe defendant was a danger to others and the dangerous patient exception applied]; *Hopkins, supra,* 44 Cal.App.3d at pp. 673–674 [defendant's confession to psychiatrist of a violent robbery was reasonable cause to believe defendant was a danger to others within the meaning of section 1024]; cf. *Mathews, supra*, 8 Cal.5th at p. 799 (dis. opn. of Cantil–Sakauye, C.J.) [by its own terms, "the exception set forth in section 1024 is not limited to *seriously* dangerous patients" (original italics), and reviewing courts should not engage in further attempts to judicially define "dangerous"].)

The trial court did not abuse its discretion by permitting Ellsworth's testimony under section 1024's exception to the privilege.[23]

---

[23] Because we conclude that section 1024's exception to the privilege applied here, we need not and do not address whether the separate exceptions to the privilege found in the elder abuse reporting provisions of the Welfare and Institutions Code would independently also apply. (See Welf. & Inst. Code, §§ 15632 & 15637.)

## II. THE VICTIM DISSUASION CONVICTION

We also ordered the parties to file supplemental briefs regarding whether Victoria's conviction for violating Penal Code section 136.1, subdivision (b)(2)[24] was affected by our Supreme Court's April 2024 decision in *People v. Reynoza* (2024) 15 Cal.5th 982 (*Reynoza*), a decision which was issued after the initial briefing in this case was completed.

In response, Victoria argues that her conviction on this count must be reversed because, as she reads *Reynoza,* in order to violate 136.1(b)(2) a defendant must attempt to dissuade a victim *both* before *and* after charges are filed. Because her dissuasive conduct here occurred solely prior to charges being filed, the evidence was therefore insufficient to support a conviction. Relatedly, she adds that the jury was also improperly instructed on her newly–interpreted nature of the offense.[25]

We reject Victoria's interpretation of *Reynoza*'s holding and her construction of 136.1(b)(2). Moreover, the jury was properly instructed with the standard instruction, which included a conjunctive "and" — not a disjunctive "or" — regarding Victoria's dissuasive intent, and neither the prosecutor nor defense counsel's closing arguments, or the evidence itself, could have misled the jury to conclude otherwise.

### A. Additional Background

Victoria was convicted of violating 136.1(b)(2) based on her attempts to dissuade Norberto from throwing her "under the bus," as she put it, after she had attempted to kill him in February 2018. In addition to Norberto's testimony, the evidence included voice mails and text messages from early March 2018. The initial felony complaint was dated

---

[24] For clarity, we refer to Penal Code section 136.1, subdivision (b)(2) as 136.1(b)(2), and do similarly for all the various constituent sub–parts of this section of the Penal Code.

[25] Victoria did not contest her conviction on this count in her original briefing.

May 31, 2018, although it was not formally filed until June 5, 2018. No evidence of any dissuasive conduct after May 31, 2018, was offered.

The jury was instructed with CALCRIM No. 2622 and told that the prosecution must prove that Victoria "tried to discourage [Norberto] from cooperating or providing information so that a complaint could be sought and prosecuted *and* from helping to prosecute that action," that Norberto was a crime victim, and that Victoria "knew she was discouraging [Norberto] from reporting victimization [and she] intend[ed] to do so." (Italics added.) The jury's verdict form shows a guilty finding for violating 136.1(b)(2), but does not describe any further factual findings.

The prosecutor's opening argument to the jury on this count explained the elements of the offense to the jury as:

> "Element one, the defendant tried to discourage [Norberto] from cooperating or providing information so that the complaint can be sought or prosecuted *and* for helping to prosecute this action. [¶] Element two, [Norberto] was a crime victim. … [¶] And then finally, Element Three, the defendant knew she was discouraging [Norberto] from reporting victimization and intended to do so." (Italics added.)

In his closing argument, defense counsel also told the jury that in order to convict on this count, the prosecution had to prove that Victoria "tried to discourage [Norberto] from cooperating or providing information so that a complaint could be sought *and* prosecuted *and* prosecute that action." (Italics added.) Thus, the use of the conjunctive "and" was consistent throughout.

Victoria does not contend that, factually, Norberto did not *cause* a complaint to be filed, nor that he did not thereafter *assist* in its prosecution; indeed, he took his tainted Cheerios with him to the hospital at the outset, fully cooperated with the sheriff's deputies, and testified both at the preliminary hearing and again four years later at trial. Thus, Victoria's contention on this point is a question of syntax, not the facts.

## B. 136.1(b)(2) and *People v. Reynoza*

"[136.1(b)(2)] makes it a crime to attempt to dissuade a victim or witness from '[c]ausing a complaint … to be sought and prosecuted, *and* assisting in the prosecution thereof.' [Fn. omitted.]" (*Reynoza, supra,* 15 Cal.5th at p. 986, original italics.) In *Reynoza*, the jury convicted the defendant based only on conduct occurring entirely *after* a criminal complaint had been filed. (*Ibid.*)

The narrow issue of statutory construction before the Supreme Court was whether 136.1(b)(2) "requires proof of an attempt to dissuade a witness from *causing* a charging document to be sought and prosecuted … or whether the statute *also* independently applies where a defendant dissuades a witness only from '*assisting* in the prosecution' of a case after the charging document has already been filed." (*Reynoza, supra,* 15 Cal.5th at p. 989, italics added (hereafter, the "causing clause" and the "assisting clause").)

Put another way, can the statute support a "*disjunctive* interpretation — in which the statute independently applies where a defendant dissuades a witness from 'assisting in the prosecution' of a case after the charging document has already been filed — or whether a *conjunctive* interpretation precludes a conviction under such circumstances." (*Id.*, at p. 986, original italics.)

The court concluded that because 136.1(b)(2) "is equally susceptible to both the conjunctive and disjunctive constructions," the rule of lenity points to an "interpretation more favorable to the defendant." (*Reynoza, supra,* 15 Cal.5th at p. 987.) As a result, the statute must be read in "the conjunctive construction, which does not permit a conviction to be based solely on proof of dissuasion from 'assisting in the prosecution' of an already-filed charging document." (*Ibid.*) Consequently, because Reynoza's "conduct amounted to, at most, dissuasion *after* a complaint was filed," the conviction had to be reversed. (*Ibid.*, italics added.) Therefore, "[w]here criminal charges have already been filed, postcharging dissuasion alone does not constitute an offense under [136.1(b)(2)]." (*Id.* at p. 1013.)

Nevertheless, the Supreme Court cautioned that because all of the defendant's conduct in that case had occurred after charges had been filed, and the initial *charging*

31.

clause had therefore not been met, it was declining to further "explore" the "contours" of the *assisting* clause. (*Reynoza, supra,* 15 Cal.5th at p. 1013.) Thus, the *Reynoza* decision pointedly did not address a factual scenario like the current case where the defendant's dissuasive conduct occurred *before* charges had been filed in order to both prevent such charges being filed *and* to later assist in the subsequent prosecution, i.e., the assisting clause. By its very terms, *Reynoza* is therefore inapposite, both factually and legally.

Victoria urges us to read *Reynoza* as requiring "both pre–charge and post–charge conduct of witness dissuasion." (Original underscore.) In other words, in order to violate 136.1(b)(2), she suggests that a defendant must commit at least *two distinct acts*, one before charges are filed *and* one afterward. Because "[n]o post–charge [dissuasion] evidence was presented" in the current case, she concludes the conviction must be reversed.

Not only is that not what the *Reynoza* court held, it is unsupported by any other authority construing the statute in this manner. Indeed, to accept this contention, we would have to essentially transform 136.1(b)(2) into an oddly indeterminate, often incomplete, continuing offense, which could only be committed when a defendant finally did something *more* to once again attempt to dissuade the victim from cooperating with the continuing prosecution of the case after charges had been filed.

Victoria admits that the *Reynoza* court "did not have occasion to explore the contours of the assisting clause," which "does leave open the question of whether the allegedly dissuading conduct before charges were filed was enough to dissuade Norberto from assisting in the prosecution after charges were filed." (Original underscore.) We fully agree. However, that is exactly why the limited statutory interpretation holding in *Reynoza* is of no real assistance here. Unlike in *Reynoza*, Victoria's conduct occurred before charges were filed but its continuing *effects*, as well as her ultimate dissuasive *intent*, were factual questions for the jury to determine within the context of the conjunctive "and," just as they were instructed by the trial court.

This also reveals the fundamentally flawed hidden premise in Victoria's argument. The gravamen of the offense is not whether the defendant's conduct successfully

32.

dissuaded the victim from causing charges to be filed *and* then assisting in the prosecution — the *victim*'s conduct — but whether the *defendant* acted so as to prevent or dissuade, or attempted to prevent or dissuade, the victim from causing *and* assisting prosecution — the *defendant's* conduct. (See 136.1(b).) Indeed, it matters not whether a defendant's acts of dissuasion or attempted dissuasion were successful or not. (136.1(d).)

Neither *Reynoza*'s limited holding nor the plain language of the statute supports her novel interpretation of 136.1(b)(2). We do not rewrite statutes; we apply them as given. Similarly, cases are not authority for propositions not considered, and the *Reynoza* decision did not address the factual situation presented here; indeed, it expressly declined to further "explore" the "contours" of the assisting clause. (*Reynoza, supra*, 15 Cal.5th at p. 1013.)

Finally, because Victoria's interpretation of *Reynoza* and 136.1(b)(2) fails at the outset, we further find that the unambiguous *conjunctively*–phrased standard jury instruction given in this case was not erroneous.

Victoria's 136.1(b)(2) conviction was not affected by *Reynoza.*

## **DISPOSITION**

The judgment is affirmed.

SNAUFFER, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.